## FEILD *v.* FARRINGTON.

1. In a suit between a consignor and his factors, who had made advances on the consignment nearly equal to its value—the allegation of the consignor being non-compliance by the factors with his order to sell—the alleged order, however, having been but a verbal one, and a conflict of testimony existing as to whether such an order was given at all—an instruction was rightly refused to the consignor, which rested the liability of the factor on the bare fact of an order to sell, and which made no allusion either to the large advances or to the fact that three weeks after the alleged order to sell was given the factors wrote to their consignor a letter informing him that they had not sold his goods, as the market had been dull and on the decline every day since he left them; that the goods would not then sell for more than so much (a decline from former prices); that they would be compelled to sell unless he made other shipments, or remitted in cash as a margin, the money market being tight; that they had held on thus far to *meet his views*, but that the declining tendency of the market induced them to write, *and asking to hear from him on his receipt of their letter;* which letter the consignor received, and purposely declined to answer.

2. Where factors have made large advances, or incurred expenses on account of the consignment, the principal cannot by any subsequent orders control their right to sell at such a time, as in the exercise of a sound discretion, and in accordance with the usage of trade, they may deem best to secure indemnity to themselves and to promote the interests of the consignor; they acting, of course, in good faith and with reasonable skill.

3. The effect of the refusal by the consignor to reply to such a letter as the one mentioned in the first paragraph above, within a reasonable time after he received it, was to raise a presumption that he approved of what his factors had done, so far as their letter informed him; and in the absence of anything to rebut that presumption, he was to be regarded as having consented to whatever delay had occurred in effecting a sale, even though the delay was contrary to his directions.

4. The receipt and non-acknowledgment of such a letter would not, however, relieve the factors from a continuing obligation to sell within a reasonable time, all the circumstances of the case being considered; and at the best prices that could be obtained.

Hence where, after writing such a letter, the factors did not sell for nearly ten months afterwards, the market declining all the while; *Held*, that though the letter was never acknowledged, it was a question which should have been submitted to the jury, whether this long delay to sell in view of a market falling the whole time, was in the exercise of sound discretion, good faith, and reasonable diligence; and that an instruction that the consignor should bear all losses sustained after his refusal to answer the factors' letter without excepting such portion of the loss as might have been caused by the factors' fault, was error. This, notwithstanding that the court charged that, as a general principle, the factors were found to use due diligence, care, and skill in the sale of the goods, and to obey instructions given to them by the consignors in regard to the sale; this charge not having been given by way of qualification to the specific instructions previously given.

ERROR to the Circuit Court for the Eastern District of Arkansas, the case being this:

Feild, a resident of Little Rock, Arkansas, owning a quantity of cotton, put it, personally, on the 9th October, 1865, into the hands of Farrington & Howell, commission merchants of Memphis, Tennessee, with directions to sell it; cotton being then worth not less than 50 cents a pound. On the next day, being now on his way homeward, he telegraphed to them, "Do not sell my cotton till I see you." The market at this time was excited, and higher than at any subsequent time. A short time after this, Feild returned to Memphis, and being about to visit the Eastern cities, requested Farrington & Co. to make him an advance of $11,000 on the cotton, which they made him. The advance was very nearly if not quite equal to its value. He then went to the Eastern cities. According to the testimony of Farrington, by whom the business of the firm with Feild was chiefly managed, Feild, on that occasion, left the cotton "to be sold at their discretion; but expressed great confidence in higher prices;" and according to the same testimony, on his return from the Eastern cities, approved of the course of the firm in not selling, and "said he would appreciate it, and remember it in future." The market was all this time rather a declining one, and the firm justified whatever of irregularity their action in not selling in the face of their

quite large advance might be supposed to have, on the ground, sworn to by Farrington, " that Mr. Feild was always represented to them as entirely solvent and able to pay his debts, and that they wished to follow his own views about the sale." Feild, it was testified, had promised them, when making this one, further consignments.

According to the testimony of *Feild*, however, he gave Farrington & Co., when he was going to the Eastern cities, express instructions to sell within ten days, and to reimburse themselves for the money advanced; which according to his testimony they promised to do. Feild's testimony proceeded thus:

" I then went East, and returned in about fourteen or fifteen days to Memphis, where I only made an hour's stay on my way home to Little Rock, which I occupied in seeing the firm. Cotton had declined one cent on the pound since I had told them to sell, and I remonstrated with them for not having sold. They excused themselves by saying that they had only been acting for my interest, which excuse I accepted. I, however, renewed my instructions, and the last words I said to Mr. Farrington, on shaking hands with him, were these: ' Whatever you do, do not let the cotton fall one cent lower.' "

This the witness testified was between the 25th and the 28th of October, 1865. Nothing further took place till the 16th of November following, when cotton having declined, the firm thus addressed Feild:

MEMPHIS, November 16th, 1865.

DEAR SIR: We have not sold your cotton, as the market has been dull and on the decline every day since you left. The dispatches from New York yesterday quote middling cotton about 50c., and very dull. The public dispatches quote 50@51c., while the private give 49@50. Your cotton would not, in the present market, sell here for over 43@44c. As the money market is very tight, *we will be compelled to sell your cotton unless you make other shipments, or remit us as a margin in cash.*

We have held on thus far to meet *your* views, but the declin-

ing tendency of the market induces us to write this letter. *Please to let us hear from you on receipt.*

Very truly, your friends,

FARRINGTON & HOWELL.

*This letter Feild received, but never answered or in any way took notice of.* Referring in his testimony on the trial to his receipt of it, and to his omission to answer, he said thus:

".I was surprised to learn that the cotton had not been sold. I thought the plaintiffs had made themselves liable by their neglect to sell. *I was afraid to answer their letter, as I regarded it as a mere endeavor to obtain some admission or concession from me; and I concluded to abandon the matter, leaving them with whatever responsibility they might have incurred. Cotton had fallen in the market,* and I did not feel disposed to make myself a party to their delinquency."

Nothing further was said or written, on either side, till August 8th (nearly nine months after the preceding letter), when cotton still declining the firm wrote again to Feild thus:

MEMPHIS, August 8th, 1866.

DEAR SIR: We have been much astonished at not hearing from you in regard to your cotton. We wrote you on the subject, and requested a reply, but have heard nothing from you. By the same mail we wrote to other parties in your city, and we received due acknowledgment. This was many months ago, date not recollected. *When you left your cotton here you were not satisfied with the market, although that was about* 50c. When you returned from the Northern cities you approved of our efforts to promote your interest, and *that the cotton had not been sold.* The price has greatly declined, and the expenses have been going on. *Now let us hear your views.* The cotton will not pay your account, as you know, and we ask you to remit us for the balance. According to the present market the cotton would be well sold at 32c., including internal revenue. We have now *waited to meet your views* until it is necessary for something to be done. *Will you please write us on receipt of this, for we are anxious to hear from you?*

Very respectfully,

FARRINGTON & HOWELL.

This letter the firm inclosed to one of their correspondents at Little Rock (Feild's residence), in order that it might be certainly delivered to him, and it was delivered, and the firm advised accordingly. Of this second letter Feild took no notice; stating in his testimony on the trial that he had omitted to do so for the same reason that he had omitted to take notice of the first one.

About five weeks afterwards, that is to say, on the 12th September, 1866, cotton having gradually declined from the month in which it was put into the hands of Farrington & Co. till now, they sold it all; the chief part at 30 cents a pound, and the residue at 25 and 20 cents. "The cotton was sold at this time," said Farrington in his testimony, "because we had despaired hearing of Mr. Feild, who appeared to us to have abandoned it, and to have had no intention of assuming the control of it, or of paying us the amount he owed us. . . . I had but one wish," he continued, "and that was to act in a manner which would be satisfactory to Mr. Feild."

Feild was immediately advised by letter of the sale, and that low as the prices obtained seemed, the sale was at the highest rates of the then market, and that the firm would send account sales and account as soon as the cotton was delivered. To this letter Feild paid no attention.

Five days afterwards, that is to say, on the 17th September, 1866, the cotton being now delivered, the firm sent the accounts, and drew for $6695, the difference between the sum due on the advance made in October, 1865, and the sum for which the cotton was now sold. Feild took no notice of this letter, and refused payment of the draft.

Whereupon in January, 1867, Farrington & Howell sued him in the court below for the balance.

On the trial the defendant asked the court to give the following instructions, to wit:

"1. If the jury find from the evidence that, after the cotton was placed in the hands of the plaintiffs, Feild gave them instructions to sell before the price should fall any lower, and that

the plaintiffs failed to do so, then the plaintiffs must suffer any loss occasioned by reason of their failure to sell at that time, and Feild is entitled to a credit for the amount that the cotton would have brought if sold at the time such instructions were given.

"2. If the jury find from the evidence that the cotton was left by the defendant in the hands of the plaintiffs to sell without any specific orders as to the time and mode of sale, and that the plaintiffs had made large advances on account of said cotton, then the plaintiffs were bound to sell, in the exercise of a sound discretion, at such time and in such mode as the usage of trade might require, and to reimburse themselves for their advances out of the proceeds of the sale, and the defendant could not, by his silence, prevent the plaintiffs from making such sale; and if the jury find from the evidence that the plaintiffs did not exercise a sound discretion in the premises, and kept the cotton on hand for an unreasonable and improper length of time, then the defendant is entitled to a credit for the amount which it would have brought, if sold in accordance with the usage of trade and the exercise of such discretion.

"3. If the jury find from the evidence that the cotton was shipped, by the defendant, to the plaintiffs, as commission merchants, to be sold; and that the plaintiffs made large advancements on the same; and that the plaintiffs wrote to the defendant that, unless other shipments were made them, or the defendant made them remittances in cash, they would sell the cotton, then, on the failure of defendant to write to plaintiffs in reply, the plaintiffs were bound to sell the cotton in a reasonable time; and the defendant is entitled to a credit on the plaintiffs' demand for the amount which the cotton would have brought, if sold within a reasonable time after the failure of the defendant to answer said letter."

But the court refused to give these instructions, or any of them; and in lieu thereof, instructed the jury:

"That in case they find that defendant gave the plaintiffs instructions orally to sell the cotton before any further fall in the price; and that the plaintiffs failed to do so, but afterwards, on the 16th day of November, 1865, wrote the letter of that date; and that Feild refused to answer the same, then the plaintiffs are responsible for any loss sustained by reason of the fall in

prices up to the time of the failure of the defendant to reply to said letter, but all losses sustained after that time must be borne by the defendant."

The court also charged that, as a general principle, the plaintiffs, as factors, were bound to use due diligence, care, and skill in the sale of the cotton committed to them for sale; and that it was their duty to obey instructions given them by defendant in regard to a sale.

Exceptions were taken to the refusal to charge as asked, and to the charge as given, and verdict and judgment having gone for the plaintiffs, in $5690, the defendant brought the case here, where it was submitted on briefs.

*Messrs. Watkins and Rose, for the plaintiffs in error; Mr. A. H. Garland, contra.*

Mr. Justice STRONG delivered the opinion of the court.

There is some conflict in the testimony respecting the instructions given to the plaintiffs below by the defendant, at the time when he obtained the advance on his consignment, and at the time when he last saw them, some fifteen days afterwards. It is claimed that he then gave them instructions to sell the cotton before the price should fall any lower, and that this direction was given not later than the 28th of October, 1865. It was upon this theory that his first prayer for instructions to the jury was framed. It is very obvious that no such directions, as that prayer asked for, should have been given to the jury. The prayer was based upon a very imperfect statement of the case. It overlooked material facts, without considering which it could not be determined to what amount of credit he was entitled. There was undisputed evidence that on the 16th of November, 1865, some three weeks after the defendant's alleged directions were given to the plaintiffs, they wrote to him a letter informing him that they had not sold his cotton, as the market had been dull and on the decline every day since he left, that his cotton would not then sell for more than from forty-three to forty-

four cents per pound, and that they would be compelled to
sell unless he made other shipments, or remitted in cash as
a margin, the money market being tight.   They wrote far-
ther that they had held on thus far to meet his views, but
that the declining tendency of the market induced them to
write, and they asked to hear from him on his receipt of
their letter.   It was also in evidence that the defendant re-
ceived this letter, and that he purposely declined to answer
it.   No allusion was made to these facts in the defendant's
first prayer for instructions to the jury.   Yet it is manifest
they ought not to have been overlooked by the court, for
they bear directly upon the question whether the defendant
was entitled to credit for the sum for which the cotton would
have sold if the plaintiffs had sold it before the price fell in
the market.   The effect of his refusal to reply to their letter
within a reasonable time after he received it, was undoubt-
edly to raise a presumption that he approved of what his
factors had done, so far as their letter informed him.   In
the absence of anything to rebut that presumption, he must
be regarded as having consented to whatever delay had oc-
curred in effecting a sale, even though it was contrary to his
directions.   He could not, therefore, hold his factors respon-
sible for the consequences of acts which he had ratified.
Mr. Livermore, in his Treatise on Agency,* says that "when
the relation of principal and agent does in fact exist, although
in the particular transaction the agent has exceeded his au-
thority, an intention to ratify will always be presumed from
the silence of the principal who has received a letter inform-
ing him what has been done on his account."   And in Story
on Agency,† it is said that, "In the ordinary course of busi-
ness between merchants and their correspondents, it is un-
derstood to be the duty of one party receiving a letter from
the other to answer the same within a reasonable time, and
if he does not, it is presumed he admits the propriety of the
acts of his correspondent, and confirms and adopts them."

* Vol. 1, p. 50.

† ? 259; see also Abbe *v.* Rood, 6 McLean, 106, and Norris *v.* Cook, 1
Curtis, 464.

Whatever, then, may have been the instructions given to the plaintiffs by the defendant respecting the time of sale, even though they were disobeyed, and though the cotton was not sold before the price had fallen, his refusal or neglect to reply to the plaintiffs' letter of November 16th, 1865, which notified him of the fall in the market price, and informed him that they had not sold but had held on thus far to meet his views, must be deemed an approval of their delay, and equivalent to an antecedent authority. It has been argued that at most it raised a presumption of fact that should have been submitted to the jury. To this it may be answered there was nothing in the case to repel the presumption, and the jury would, therefore, have been bound by it had it been submitted. But the defendant's prayer for instruction ignored it, and, in effect, called upon the court to withdraw it from the jury.

There is still another reason why the court should not have affirmed the defendant's first proposition. The plaintiffs had made large advances on the cotton consigned to them, advances very nearly, if not quite, equal to its value, and much more than its market value at any time after their letter to the defendant was written. They had, therefore, acquired a special property in the cotton, and they held it for their own indemnity as well as for the benefit of the defendant. Now, though it is true that factors are generally bound to obey all orders of their principals respecting the time and mode of sale, yet when they have made large advances or incurred expenses on account of the consignment, the principal cannot by any subsequent orders control their right to sell at such a time as in the exercise of a sound discretion, and in accordance with the usage of trade, they may deem best to secure indemnity to themselves, and to promote the interests of the consignor. Of course they must act in good faith and with reasonable skill. This is the rule as laid down in *Brown* v. *McGran*,* in which it was said that "where a consignment has been made generally

* 14 Peters, 479.

without any specific orders as to the time or mode of sale, and the factor makes advances or incurs liabilities on the footing of such consignment, then the legal presumption is, that the factor is intended to be clothed with the ordinary rights of factors to sell, in the exercise of a sound discretion, at such time and in such mode as the usage of trade and his general duty require, and to reimburse himself for his advances and liabilities out of the proceeds of sale, and the consignor has no right, by any subsequent orders given after advances have been made or liabilities incurred by the factor, to suspend or control this right of sale, except so far as respects the surplus of the consignment not necessary to the reimbursement of such advances or liabilities." In view of this it is apparent that the jury had more to find than the fact that Feild gave instructions to sell the cotton before any fall in the price, in order to justify a credit to him for the amount the cotton would have brought if sold at the time the instructions were given. There was, therefore, no error in denying the defendant's first prayer for instructions to the jury.

And the second prayer was correctly refused for the reason that it allowed no effect to the letter of November 16, 1865, and the defendant's refusal to reply.

But we think there was error in refusing to affirm the defendant's third proposition, and the instruction which was given.

The instruction given, we think, was not sufficiently qualified. It gave undue effect to the plaintiff's letter and to the defendant's neglect, or refusal, to reply to it. Surely it cannot be maintained that, by leaving their letter unanswered, the defendant relieved the plaintiffs from the consequences of subsequent neglect, or want of good faith. His silence, at most, was an assent to what they had done up to the time when they informed him of their breach of his orders. It was a condonation of past neglect, not a permission given for future negligence or faithlessness. It did not relieve the plaintiffs from their continuing obligation to sell the cotton within a reasonable time, all the circumstances

of the case being considered, and to sell at the best price that could be obtained. They were still his factors, and under the obligations of factors. Though the order to sell before a fall in the price had expired, they were still agents to sell, and without any particular instructions. It cannot be said that the letter of the plaintiffs proposed, or that the defendant by his silence assented to an indefinite or unreasonable postponement of a sale of the cotton. On the contrary, the letter threatened an immediate sale, unless other shipments were made or cash was remitted, and the silence of the defendant can be deemed no more than an assent to what his correspondents had done, and to what they proposed to do. Yet the charge of the court shielded them against all responsibility for good faith and diligence after the defendant neglected to reply to their letter, and threw upon him all loss sustained after that time, though it may have been occasioned in whole or in part by their failure to sell when they should have sold. The plaintiffs held the cotton, without making a sale, nearly ten months after their letter of November 16, 1865, in which they notified the defendant that they would be compelled to sell unless he made other shipments or remittances. During this period the price of cotton was constantly falling in the market, until at last they sold what they said was worth in November, 1865, forty-three to forty-four cents, for thirty, twenty-five, and twenty cents. Whether this long delay, in view of a falling market, was in the exercise of a sound discretion, good faith, and reasonable diligence, was a question that should have been submitted to the jury. If the delay was unreasonable, if it was in violation of the plaintiffs' duty as factors, they, rather than the defendant, should bear the loss that resulted from it. Such was the instruction the defendant sought to obtain by his third prayer; but it was denied, and the jury were charged that he must bear all losses sustained after his refusal to answer the plaintiffs' letter, without excepting such portion of the loss as may have been caused by the fault of the plaintiffs. Herein we think was error.

It is true the court also charged that, as a general principle, the plaintiffs, as factors, were bound to use due diligence, care, and skill in the sale of the cotton, and to obey instructions given them by the defendant in regard to the sale. But this was not said as a qualification of the specific instructions previously given, and the jury must have understood that if they found the facts as stated by the court, they must charge the defendant with all the loss which accrued after his failure to answer the plaintiffs' letter.

The judgment must, therefore, be

REVERSED, AND A NEW TRIAL ORDERED.