## JONES *v.* GALLAGHER.

STOCKBROKER'S LIEN.—Defendant bought and sold mining stocks for speculation, through plaintiff, his banker, who advanced moneys for their purchase. Plaintiff bought and sold in his own name, but under the direction of defendant, charging him with the advances and interest, and crediting him with the stocks and the proceeds of their sales. At a time when defendant was largely indebted for advances, he directed plaintiff to sell all stocks on hand and reinvest in others, which plaintiff refused to do, whereby large profits were lost. Subsequently plaintiff sold the stocks at a price less than they could have been sold for at the time of the order to sell and reinvest, and brought suit for balance of unpaid advances against defendant, who pleaded as counter-claim the damages arising from plaintiff's refusal to sell and reinvest and subsequent sale. *Held*, that the counter-claim could not be allowed; that plaintiff had a special property in the stocks for the advances made in their purchase, which security he could not be compelled to surrender without his consent; that the order to sell and reinvest constituted one indivisible order, and under it plaintiff was not at liberty to sell except for the purposes of reinvestment.

QUESTIONS OF FACT FOR JURY.—Whether the plaintiff falsely reported other sales of other stocks of defendant, to defendant's damage, were questions of fact, which should have been left to the jury, and it was error to refuse to charge thereon when requested by plaintiff.

APPEAL from the third district court. The plaintiff sued defendant for a balance of moneys loaned and advanced to defendant from January 15, 1877, to January 15, 1879. The defendant admitted the advances, but by way of counter-claim claimed damages for a failure of plaintiff to sell certain mining stocks on the order of defendant, and convert the proceeds of such sale into other stocks. The order was by telegram from Virginia City, Nevada, sent to and received at Salt Lake city, Utah, and is as follows:

"November 13, 1878.

"Turn my Tip Top, Justice, and Alta, without limit, into North Bonanza, limit $2¾."

This order plaintiff refused to obey, but subsequently the plaintiff sold the above stocks, claiming a lien upon them for the moneys advanced to defendant, at a price less than they could have been sold for on the day of the order to sell and convert into North Bonanza. The defendant also alleged, as a further counter-claim, that plaintiff had reported to him sales of Challenge and Ophir stock held by plaintiff to defendant's account at certain prices, but that in fact the sales were not made as reported, but that said stock was held by plaintiff long after the time of such reported sales, and by him subsequently sold at an increased price, for which increase defendant claimed credit. The plaintiff disputed these facts.

Plaintiff requested the following instructions, which were refused:

7. The telegram of the defendant of November 13, 1878, is not an unconditional order to sell the stocks named, but only authorizes a sale and reinvestment in North Bonanza; and it was not an authority to plaintiff to sell and credit the proceeds, nor to sell for any purpose other than such reinvestment.

3. In respect to this counter-claim [the refusal of plaintiff to sell and convert, and subsequent sale of Tip Top, Alta, and Justice stock], you are instructed that if from the course of dealing between the parties, or their mutual assent, it was understood between them that the plaintiff should advance moneys to buy the stocks, charging interest on advances, and buying and holding the stocks in his own name, though for

the account of defendant, and that the defendant should, if necessary or required, from time to time, pay money on the account, so that the market price of the stocks held should be equal to his account, the legal effect of the transaction was a pledge to the plaintiff of the stocks so held, or their proceeds, as security for the purchase price and interest.

4. If you find from the mutual dealing of the parties, or their mutual assent, they understood the defendant had not the right to order the stocks sold and withdraw the money, leaving the purchase price and interest unpaid to the plaintiff, the stocks, or the proceeds, were pledged, and the plaintiff was not the mere agent of the defendant, so long as the purchase price and interest were unpaid.

15. The plaintiff asks that the jury be instructed to disregard all the evidence relating to the North Bonanza stock.

9. It is claimed as another counter-claim that the plaintiff reported a sale of six hundred Challenge on the twenty-seventh and twenty-ninth days of November, 1878, but it is alleged that he held it until it went up to five dollars and seventy-five cents. If you find the stocks were actually sold as reported, the defendant is not entitled to any damages on account of this sale.

10. The defendant also sets up a counter-claim by alleging, in substance, that the plaintiff pretended to sell fifty Ophir November 22, 1877, and in fact held it, crediting defendant thirty-seven dollars and fifty cents per share, and that afterwards it was of much greater value. If you find the plaintiff made the sale as reported, the defendant is not entitled to any damages on this counter-claim.

The defendant had judgment upon verdict. The plaintiff appealed.

*Bennett & Harkness,* for the appellant.

Though there was no express agreement between the parties as to the terms and conditions of their dealings (except as to interest on plaintiff's advances), we claim that what they understandingly and without objection did shows exactly what they impliedly agreed, and conversely that they agreed to deal together in the manner the business was done, and that the same legal consequences follow the agreement im-

plied from their acts that would follow an express agreement for those acts.

The legal effect of the dealings was a pledge of the stocks: *Markham* v. *Jandon,* 41 N. Y. 235.

Defendant claims the plaintiff did the business as a banker. We do not think it pertains to the banking business; and the fact that plaintiff was engaged in banking is immaterial. If, however, it be regarded as a banking transaction, the effect is the same.

A banker, as such, has a general lien on all the securities in his possession belonging to the customer for a general balance. And this, though the legal title to the securities is in the customer: *Bank of Metropolis Case,* 1 How. 235; Dunlap's Paley on Agency, 131; Morse on Banking, 2d ed., 42 et seq. Factors have a general lien on all property of the principal in their possession for a general balance: Dunlap's Paley on Agency, 128, 129. Goods subject to the lien are in the nature of a pledge: Id. 142. A factor is distinguished from the broker or ordinary agent by having the property of the principal in his possession, with the right to sell as his own in his own name; and from the possession with such power the general lien arises. Can any case be found where a person who buys and holds property in his own name, and with his own money, can be forced to deliver it or exchange it for other property without his consent until the purchase price is paid?

The refusal of the seventh instruction was based upon the theory that the meaning of the telegram of November 13th was a question of fact for the jury, yet no such question was submitted in the charge.

The tenth instruction meets the allegation of the answer fully. It is uncontradicted that the order for sale (plaintiff's exhibit 15) was given; that a sale was reported within a week, and that the defendant has ever since had carried in his account a credit at thirty-seven dollars and fifty cents per share. The plaintiff had the right to have the jury told what facts would make a defense, unless the evidence that a sale was not made was so clear and uncontradicted that, as a matter of law, the court could direct a verdict on this question.

*Sutherland & McBride*, for the respondent.

The plaintiff had no lien on the defendant's stocks. A lien is a mere right to retain possession until some debt or charge is paid : 2 Bouv. Law Dic. 47.

All liens recognized at common law are of this description. Possession is necessary to their existence and continuance. When possession is lost, the lien ceases. If possession is voluntarily given up, the lien is waived : *Green* v. *Farmer*, 4 Burr. 2221 ; *Danforth* v. *Pratt*, 42 Me. 50 ; *Sawyer* v. *Fisher*, 32 Id. 28 ; *Bank etc.* v. *Jones*, 4 N. Y. 497 ; *Chase* v. *Westmore*, 5 Mau. & Sel. 180 ; *Stevenson* v. *Blakelock*, 1 Atk. 235 ; *Bigelow* v. *Heaton*, 4 Denio, 496 ; *Legg* v. *Willard*, 17 Pick. 140 ; *King* v. *Ind. O. C. Co.*, 10 Cush. 231 ; *Jarvis* v. *Rogers*, 15 Mass. 389 ; *Allen* v. *Megguire*, 15 Id. 490 ; *Cowell* v. *Simpson*, 16 Ves. 275 ; *Chandler* v. *Belden*, 18 Johns. 157 ; *Hutchins* v. *Olcott*, 4 Vt. 549 ; *Stoddard W. Mfg. Co.* v. *Huntley*, 8 N. H. 441 ; *Lucas* v. *Darien*, 7 Taunt. 278 ; *Randall* v. *Brown*, 2 How. 406 ; *Mountford* v. *Scott*, 1 Turn. & R. 274.

The foregoing authorities declare the necessity of possession to create or continue a lien, and they also declare that where there is a special agreement made or act done inconsistent with the existence of a lien, such as an agreement to give credit, or the possession is acquired and held for another distinct purpose, and that only, and that purpose is inconsistent with the purpose of a lien, none exists.

To the question with which appellant's counsel concludes the first point in their brief we reply with this question: Can any case be found where an agent holding his principal's property for the purpose and on the terms of selling it exclusively on the principal's order, and after a thousand compliances with such orders, has been recognized as all along having a lien on the peoperty which it was his acknowledged duty to sell, and such a lien as entitled him at any time and at all times to gainsay his principal's orders ? See *Bell* v. *Palmer*, 6 Cow. 128; *La Farge* v. *Kneeland*, 7 Id. 476.

The plaintiff's seventh request was properly refused, because the telegram was peremptory, and would not bear the construction stated in the request; refusal was therefore no error.

The plaintiff's ninth request was properly refused. His

action on the thirteenth and subsequent days in November, 1878, amounted to a conversion of defendant's stock, and defendant was not bound by the proceeds received, if within a reasonable time the pride advanced.

The refusal of the plaintiff's tenth request was immaterial, for no damages were claimed by the defendant in the event mentioned, and by the answer and instructions asked, he by necessary implication disclaimed any such damages.    It is no error to refuse an irrelevant charge, or one against the allowance of damages not claimed.

TWISS, J.:

This action is brought to recover the sum of five thousand dollars, loaned and advanced by the plaintiff to defendant for defendant's use between the fifteenth day of January, 1877, and the fifteenth day of January, 1879.

The plaintiff is a banker, and the sum sued for is a correct statement of his account, which the defendant admits would be due the plaintiff were it not for the counter-claims alleged in the answer.

The evidence shows that during the time the account was accruing, the plaintiff purchased with his own money for the defendant stocks upon the order or request of the defendant, taking title to them in his own name; and until the thirteenth day of November, 1878, sold the same as directed or requested by the defendant, charging him interest for the money so used.    That on the day last named the plaintiff held—which had theretofore been purchased as aforesaid for the defendant—three hundred and twenty shares of Justice stock, worth nine dollars per share; fifty shares of Alta stock, worth eighteen dollars per share; and two hundred shares of Tip Top stock, worth one dollar and eighty cents per share, which the defendant on that day directed the plaintiff to sell, and invest the proceeds of such sales in the stock of the North Bonanza, at a price per share not exceeding two dollars and seventy-five cents.    The plaintiff refused to comply with this direction, saying: "Not knowing anything about North Bonanza, except its feline reputation, I must decline to relinquish Comstock securities for 'wild cats,' although by the turn you propose we should have more of

them." The North Bonanza soon afterwards advanced to upwards of five dollars per share, and remained there for a day or two; since then it has been down to twenty-five cents, and from that up to a dollar and a half, and has been regularly assessed. If the plaintiff had complied with the directions of the defendant, and the North Bonanza stock had been sold at the time when it was at the highest price, there would have been a profit in the deal of about six thousand dollars, which the defendant claims as one item in his counter-claim.

Was the plaintiff under obligation to sell the stock and invest the proceeds of such sale, as directed by the defendant? In other words, did the plaintiff have such an interest in the stock which he was directed to sell as would enable him to disregard the express directions to sell and reinvest, without incurring liability to the defendant for the results of such refusal to act?

The plaintiff and defendant both say in their testimony that the plaintiff held the stock as security for the payment of the account. The defendant drew from the plaintiff when the stocks held by him were in excess of the amount of the account. The defendant in his testimony says: "It was understood in a general way that I should keep the account good, or make it good. I was to give him money when he wanted it, and to take money down when I wanted it. In 1878 he began to call on me for money, and I was unable to put it up. The stocks I then had were not sufficient to make my account good; I think my account was several thousand dollars behind—selling at the market prices. That condition of affairs had existed for several months; I think I got into extremely deep water during the spring. He asked once or twice for money, and as long as I thought I had a chance to pull through, I said I would try to pay as soon as I could; then when I found I could not get through, I told him I did not know when I could. * * * He was not to buy all the stocks I ordered without reference to the state of my account; I could have swamped him if he did. As my account then stood, I reasoned that when I ordered any particular stock bought, he had the right to buy or not as he chose, depending on the state of my account. In the condition my credit was with him at that time, I would have to provide

for the payment of the stock ordered. That is the reason I provided for the purchase of this stock by ordering the sale of other stocks. There was no agreement as to the amount of stock he would buy, nor of what kinds; he always bought anything I asked him to. I suppose each transaction amounted to a separate one. If he chose to fill it, all right; if he didn't, all right. I don't suppose I could have made him buy stocks unless he wanted to; he usually wanted to, though."

From the facts testified to by both plaintiff and defendant, it is apparent beyond controversy that upon the purchase of stock for the defendant by the plaintiff, with his own money, credit was given upon the stocks held for the defendant by the plaintiff, and as a conclusion of law, the plaintiff had a special property in the stocks purchased by him with his own money, the title to which was made to himself, with the knowledge and without objection of defendant, and therefore with his acquiescence; that he held them as security for the money advanced by him in their purchase, as well as for the benefit of the defendant, for the purpose for which they were purchased: *Brown* v. *McGran,* 14 Pet. 479.

If the plaintiff had simply held these stocks for sale, he would have been the agent or factor of the defendant for the purpose of selling them, and as such was bound to comply with his directions as to their sale.

But they were not consigned to the plaintiff for sale, nor were they purchased with the intention of holding them for accruing dividends, but for the purpose of speculating upon their fluctuating prices. At the time the order for sale was given, the account of plaintiff exceeded the value of the stocks held by him, therefore the defendant was not the absolute owner; nor was he entitled to the absolute control and disposition of them. Each party had interest which the other was bound to respect; and each was bound to act in good faith and in the exercise of a sound discretion, so far as his acts affected the interest or rights of the other; and the plaintiff was not compelled to obey an order to sell given to him by the defendant that would unnecessarily result in a loss or damage to himself. Suppose the order to sell to be construed to be distinct and disconnected with the order to re-

invest, the good faith and the exercise of a sound discretion on the part of the plaintiff in refusing to sell should have been, with proper instructions, submitted to the jury: *Field* v. *Farrington*, 10 Wall. 141. But I am not of the opinion that this dispatch contains two distinct and separate orders, one to sell, the other to reinvest. The words, "Turn my Tip Top, Justice, and Alta, without limit, into North Bonanza," constitute one indivisible order, an entirety; the order to sell was inseparably connected with the order to reinvest; he had no authority to sell and apply the proceeds in payment of defendant's account. The direction was to turn the stocks named in North Bonanza; if he performed one, he must comply with the other. This direction was given at a time when defendant says, "I think my account was several thousand dollars behind;" and "that condition of affairs had existed for several months." This order in effect directed the plaintiff to dispose of certain securities held by him, and to take another in place of them. I do not find in the examination of the record and testimony any contract or understanding between the parties requiring the plaintiff to do it. The order to sell and reinvest being one, the plaintiff was not obliged to comply with it; the difference between the value of the stocks at the time the order was made and at the time they were afterwards sold is immaterial in this action; the right of the plaintiff to sell at the time of sale, and the good faith and sound discretion in which it was made, are not in issue.

I am therefore of the opinion that the verdict allowing damages for the failure of plaintiff to sell the Justice, Alta, and Tip Top mining stocks, as directed by the defendant on November 13, 1878, is not supported by any evidence rightfully before the jury; and that there was error in admitting evidence as to the value of the stock of the North Bonanza, in support of the item in counter-claim based upon the failure of the plaintiff to comply with the order to purchase.

The questions raised by the allegations of the defendant claiming damages because the plaintiff reported to him sales of Challenge and Ophir stocks, when in fact, as defendant alleges upon his information and belief, they were not sold, as reported by plaintiff, but were held by him for a long time, and afterwards sold at an advanced price, were properly

submitted to the jury by instructions 9 and 10, requested by the plaintiff, in which the jury were instructed that if the sales were made and stocks sold as reported, the defendant was not entitled to the damages claimed in his counter-claim by reason of such alleged report of sale and subsequent sale of the stocks; which instructions were refused by the court.

Judgment reversed, and the case remanded for new trial.

EMERSON, J., concurred.

HUNTER, C. J., dissented.