# HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* GERHARDT.*

No. 779.   Argued April 7, 8, 1938.—Decided May 23, 1938.

---

*Together with No. 780, *Helvering, Commissioner of Internal Revenue,* v. *Wilson;* and No. 781, *Same* v. *Mulcahy,* also on writs of certiorari to the Circuit Court of Appeals for the Second Circuit.

*Assistant Solicitor General Bell,* with whom *Solicitor General Jackson, Assistant Attorney General Morris,* and *Messrs. Sewall Key, Berryman Green* and *Warner W. Gardner* were on the brief, for petitioner.

*Mr. Julius Henry Cohen,* with whom *Mr. Austin J. Tobin* was on the brief, for respondents.

*Mr. Henry Epstein,* Solicitor General of New York, argued the cause on behalf of that State and other States, as *amici curiae* by special leave of Court.*

By leave of Court, *Mr. Markell C. Baer* filed a brief as *amicus curiae,* on behalf of the American Association of Port Authorities, in support of respondents.

---

\* These States, and the names of their respective Attorneys General appearing on an elaborate brief are: New York, by *Mr. John J. Bennett, Jr.;* Alabama, by *Mr. Albert A. Carmichael;* California, by *Mr. U. S. Webb;* Connecticut, by *Mr. Charles J. McLaughlin;* Delaware, by *Mr. P. Warren Green;* Indiana, by *Mr.*

Mr. Justice Stone delivered the opinion of the Court.

The question for decision is whether the imposition of a federal income tax for the calendar years 1932 and 1933 on salaries received by respondents, as employees of the Port of New York Authority, places an unconstitutional burden on the States of New York and New Jersey.

The Port Authority is a bi-state corporation, created by compact between New York and New Jersey, Laws of N. Y., 1921, c. 154; Laws of N. J., 1921, c. 151, approved by the Congress of the United States by Joint Resolution of August 23, 1921, c. 77, 42 Stat. 174. The compact authorized the Authority to acquire and operate "any terminal or transportation facility" within a specified district embracing the Port of New York and lying partially within each state. It directed the Authority to recommend a comprehensive plan for improving the port and facilitating its use, by the construction and operation of bridges, tunnels, terminals and other facilities. The Authority made such a recommendation in its report of December, 1921, adopted by the two states in 1922. Laws of N. Y., 1922, c. 43; Laws of N. J., 1922, c. 9.

In conformity to the plan, and pursuant to further legislation of the two states, the Authority has con-

Omer S. Jackson; Louisiana, by Messrs. Gaston L. Porterie, and Joseph A. Loret, Special Assistant Attorney General; Massachusetts, by Mr. Paul A. Dever; Michigan, by Mr. Raymond W. Starr; Mississippi, by Mr. Greek L. Rice; Montana, by Mr. Harrison F. Freebourn; Nevada, by Mr. Gray Washburn; New Jersey, by Mr. David Wilentz; New Hampshire, by Mr. Thomas P. Cheney; North Carolina, by Mr. A. A. F. Seawell; Ohio, by Mr. Herbert S. Duffy; Oregon, by Mr. I. H. Van Winkle; Pennsylvania, by Mr. Charles J. Margiotti; Rhode Island, by Mr. John P. Hartigan; Utah, by Mr. Joseph Chez; Vermont, by Mr. Lawrence C. Jones; Virginia, by Mr. Abram P. Staples; Washington, by Mr. G. W. Hamilton; Wisconsin, by Mr. Orland S. Loomis; and Wyoming, by Mr. Ray E. Lee.

structed the Outerbridge Crossing Bridge, the Goethals Bridge, the Bayonne Bridge, and the George Washington Bridge, interstate vehicular bridges all passing over waters of the harbor or adjacent to it. It has also constructed the Holland Tunnel and the Lincoln Tunnel, interstate vehicular tunnels passing under the Hudson River. These enterprises were financed in large part by funds advanced by the two states and by the Port Authority's issue and sale of its bonds. In addition, the Authority operates an interstate bus line over the Goethals Bridge. It has erected and operates the Port Authority Commerce Building in New York City, which houses Inland Terminal No. 1, devoted to use as a freight terminal in connection with a plan to coördinate transportation facilities and reduce congestion. The terminal has no physical connection with any railroad facilities, dock or pier, but is used as a transfer terminal for interchange of freight brought by truck from and to the terminal and to and from eight railroad terminals.

The Port Authority collects tolls for the use of the bridges and tunnels, and derives income from the operation of the bus line and terminal building, but it has no stock and no stockholders, and is owned by no private persons or corporations. Its projects are all said to be operated in behalf of the two states and in the interests of the public, and none of its profits enure to the benefit of private persons. Its property and the bonds and other securities issued by it are exempt by statute from state taxation. The Joint Resolution of Congress consenting to the comprehensive plan of port improvement, Pub. Res. No. 66, 67th Cong., H. J. Resolution No. 337, July 1, 1922, declares that the activities of the Port Authority under the plan "will the better promote and facilitate commerce between the States and between the States and foreign nations and provide better and cheaper transportation of property and aid in providing better

postal, military, and other services of value to the Nation." Statutes of New York and New Jersey relating to the various projects of the Port Authority declare that they are "in all respects for the benefit of the people of the two States, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions, and the Port Authority shall be regarded as performing a governmental function in undertaking the said construction, maintenance and operation and in carrying out the provisions of law relating to the said [bridges and tunnels] and shall be required to pay no taxes or assessments upon any of the property acquired by it for the construction, operation and maintenance of such" bridges and tunnels. Laws of N. J., 1925, c. 37, § 7; Laws of N. Y., 1925, c. 210, § 7; Laws of N. J., 1926, c. 6, § 7; Laws of N. Y., 1926, c. 761, § 7; Laws of N. J., 1927, c. 3, § 7; Laws of N. Y., 1927, c. 300, § 7; Laws of N. J., 1931, c. 4, § 14; Laws of N. Y., 1931, c. 47, § 14.

The respondents, during the taxable years in question, were respectively a construction engineer and two assistant general managers, employed by the Authority at annual salaries ranging between $8,000 and $15,000. All took oaths of office, although neither the compact nor the related statutes appear to have created any office to which any of the respondents were appointed, or defined their duties or prescribed that they should take an oath. The several respondents having failed to return their respective salaries as income for the taxable years in question, the commissioner determined deficiencies against them. The Board of Tax Appeals found that the Port Authority was engaged in the performance of a public function for the States of New York and New Jersey, and ruled that the compensation received by the Authority's employees was exempt from federal income tax. The Court of Appeals for the Second Circuit, 92 F. 2d 999,

affirmed without opinion on the authority of *Brush* v. *Commissioner*, 85 F. 2d 32, rev'd, 300 U. S. 352; *Commissioner* v. *Ten Eyck*, 76 F. 2d 515, and *New York ex rel. Rogers* v. *Graves*, 299 U. S. 401. We granted certiorari because of the public importance of the question presented.

The Constitution contains no express limitation on the power of either a state or the national government to tax the other, or its instrumentalities. The doctrine that there is an implied limitation stems from *McCulloch* v. *Maryland*, 4 Wheat. 316, in which it was held that a state tax laid specifically upon the privilege of issuing bank notes, and in fact applicable alone to the notes of national banks, was invalid since it impeded the national government in the exercise of its power to establish and maintain a bank, implied as an incident to the borrowing, taxing, war and other powers specifically granted to the national government by Article I, § 8 of the Constitution. It was held that Congress, having power to establish a bank by laws which, when enacted under the Constitution, are supreme, also had power to protect the bank by striking down state action impeding its operations; and it was thought that the state tax in question was so inconsistent with Congress's constitutional action in establishing the bank as to compel the conclusion that Congress intended to forbid application of the tax to the federal bank notes.[1] Cf. *Osborn* v. *Bank of United States*, 9 Wheat. 738, 865–868.

[1] It follows that in considering the immunity of federal instrumentalities from state taxation two factors may be of importance which are lacking in the case of a claimed immunity of state instrumentalities from federal taxation. Since the acts of Congress within its constitutional power are supreme, the validity of state taxation of federal instrumentalities must depend (a) on the power of Congress to create the instrumentality and (b) its intent to protect it from state taxation. Congress may curtail an immunity which might otherwise be implied, *Van Allen* v. *The Assessors*, 3 Wall. 573, or enlarge it beyond

In sustaining the immunity from state taxation, the opinion of the Court, by Chief Justice Marshall, recognized a clear distinction between the extent of the power of a state to tax national banks and that of the national government to tax state instrumentalities. He was careful to point out not only that the taxing power of the national government is supreme, by reason of the constitutional grant, but that in laying a federal tax on state instrumentalities the people of the states, acting through their representatives, are laying a tax on their own institutions and consequently are subject to political restraints which can be counted on to prevent abuse. State taxation of national instrumentalities is subject to no such restraint, for the people outside the state have no representatives who participate in the legislation; and in a real sense, as to them, the taxation is without representation. The exercise of the national taxing power is thus subject to a safeguard which does not operate when a state undertakes to tax a national instrumentality.[2]

the point where, Congress being silent, the Court would set its limits. *Bank* v. *Supervisors*, 7 Wall. 26, 30, 31; see *Thomson* v. *Pacific Railroad*, 9 Wall. 579, 588, 590; *Shaw* v. *Gibson-Zahniser Oil Corp.*, 276 U. S. 575, 581, and cases cited; *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 161.

The analysis is comparable where the question is whether federal corporate instrumentalities are immune from state judicial process. *Federal Land Bank* v. *Priddy*, 295 U. S. 229, 234–235.

[2] "The people of all the States have created the general government, and have conferred upon it the general power of taxation. The people of all the States, and the States themselves, are represented in Congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the States, they tax their constituents; and these taxes must be uniform. But, when a State taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists,

It was perhaps enough to have supported the conclusion that the tax was invalid, that it was aimed specifically at national banks and thus operated to discriminate against the exercise by the Congress of a national power. Such discrimination was later recognized to be in itself a sufficient ground for holding invalid any form of state taxation adversely affecting the use or enjoyment of federal instrumentalities. *Miller* v. *Milwaukee,* 272 U. S. 713; cf. *Pacific Co., Ltd.* v. *Johnson,* 285 U. S. 480, 493. But later cases have declared that federal instrumentalities are similarly immune from non-discriminatory state taxation—from the taxation of obligations of the United States as an interference with the borrowing power, *Weston* v. *Charleston,* 2 Pet. 449; and from a tax on "offices" levied upon the office of a captain of a revenue cutter. *Dobbins* v. *Erie County,* 16 Pet. 435.[8]

---

and always must exist, between the action of the whole on a part, and the action of a part on the whole—between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme." Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 435–436.

[8] In these cases, and particularly in *Weston* v. *Charleston,* 2 Pet. 449, as in *McCulloch* v. *Maryland,* emphasis was laid on the fact that by state action an impediment was laid upon the exercise of a power with respect to which the national government was supreme. In *Weston* v. *Charleston, supra,* Chief Justice Marshall said (pp. 465, 466):

"Can anything be more dangerous, or more injurious, than the admission of a principle which authorizes every state and every corporation in the union which possesses the right of taxation, to burthen the exercise of this power [the borrowing power] at their discretion?

"If the right to impose the tax exists, it is a right which in its nature acknowledges no limits. It may be carried to any extent within the jurisdiction of the state or corporation which imposes it, which the will of each state and corporation may prescribe. A power which is given by the whole American people for their common good, which is to be exercised at the most critical periods for the most important purposes, on the free exercise of which the interests certainly, perhaps the liberty of the whole may depend; may be burthened, impeded,

That the taxing power of the federal government is nevertheless subject to an implied restriction when applied to state instrumentalities was first decided in *Collector* v. *Day,* 11 Wall. 113, where the salary of a state officer, a probate judge, was held to be immune from federal income tax. The question there presented to the Court was not one of interference with a granted power in a field in which the federal government is supreme, but a limitation by implication upon the granted federal power to tax. In recognizing that implication for the first time, the Court was concerned with the continued existence of the states as governmental entities, and their preservation from destruction by the national taxing power. The immunity which it implied was sustained only because it was one deemed necessary to protect the states from destruction by the federal taxation of those governmental functions which they were exercising when the Constitution was adopted and which were essential to their continued existence.

The Court pointed out that the states were in existence as such entities when the Constitution was adopted; that the Constitution guaranteed to them a republican form of government and undertook to protect them from invasion and domestic violence; that it presupposes the continued existence of the states [4] and their continued

if not arrested, by any of the organized parts of the confederacy." Compare Holmes, J., in *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 223.

[4] In 1871, when *Collector* v. *Day* was decided, the Court had not yet been called on to determine how far the Civil War Amendments had broadened the federal power at the expense of the states. The *Slaughterhouse Cases,* 16 Wall. 36, had not yet been decided, although they had already been once before the Court on motion for supersedeas, 10 Wall. 141. The fact that the taxing power had recently been used with destructive effect upon a state instrumentality, *Veazie Bank* v. *Fenno,* 8 Wall. 533, had suggested the possibility of similar

performance, free of inhibition by the national taxing power, of "the high and responsible duties assigned to them in the Constitution . . . And, more especially, those means and instrumentalities which are the creation of their sovereign and reserved rights, one of which is the establishment of the judicial department, and the appointment of officers to administer their laws. Without this power, and the exercise of it," the Court declared, "we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence. A despotic government might. We have said that one of the reserved powers was that to establish a judicial department . . . All of the thirteen States were in the possession of this power, and had exercised it at the adoption of the Constitution; and it is not pretended that any grant of it to the general government is found in that instrument." 11 Wall. 125, 126.

We need not stop to inquire how far, as indicated in *McCulloch* v. *Maryland, supra,* the immunity of federal instrumentalities from state taxation rests on a different basis from that of state instrumentalities; or whether or to what degree it is more extensive. As to those questions, other considerations may be controlling which are not pertinent here. It is enough for present purposes that the state immunity from the national taxing power, when recognized in *Collector* v. *Day, supra,* was narrowly limited to a state judicial officer engaged in the performance of a function which pertained to state governments at the time the Constitution was adopted, without which no state "could long preserve its existence."

---

attacks upon the existence of states themselves. Compare *Lane County* v. *Oregon,* 7 Wall. 71, 76–77; *Slaughterhouse Cases,* 16 Wall. 36, 82.

There are cogent reasons why any constitutional restriction upon the taxing power granted to Congress, so far as it can be properly raised by implication, should be narrowly limited. One, as was pointed out by Chief Justice Marshall in *McCulloch* v. *Maryland, supra,* 435–436, and *Weston* v. *Charleston, supra,* 465–466, is that the people of all the states have created the national government and are represented in Congress. Through that representation they exercise the national taxing power. The very fact that when they are exercising it they are taxing themselves, serves to guard against its abuse through the possibility of resort to the usual processes of political action which provides a readier and more adaptable means than any which courts can afford, for securing accommodation of the competing demands for national revenue, on the one hand, and for reasonable scope for the independence of state action, on the other.

Another reason rests upon the fact that any allowance of a tax immunity for the protection of state sovereignty is at the expense of the sovereign power of the nation to tax. Enlargement of the one involves diminution of the other. When enlargement proceeds beyond the necessity of protecting the state, the burden of the immunity is thrown upon the national government with benefit only to a privileged class of taxpayers. See *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514; cf. *Thomson* v. *Pacific Railroad,* 9 Wall. 579, 588, 590. With the steady expansion of the activity of state governments into new fields they have undertaken the performance of functions not known to the states when the Constitution was adopted, and have taken over the management of business enterprises once conducted exclusively by private individuals subject to the national taxing power. In a complex economic society tax burdens laid upon those who directly or indirectly have dealings with the states, tend, to some extent not capable of precise measurement, to be passed on

economically and thus to burden the state government itself. But if every federal tax which is laid on some new form of state activity, or whose economic burden reaches in some measure the state or those who serve it, were to be set aside as an infringement of state sovereignty, it is evident that a restriction upon national power, devised only as a shield to protect the states from curtailment of the essential operations of government which they have exercised from the beginning, would become a ready means for striking down the taxing power of the nation. See *South Carolina* v. *United States,* 199 U. S. 437, 454–455. Once impaired by the recognition of a state immunity found to be excessive, restoration of that power is not likely to be secured through the action of state legislatures; for they are without the inducements to act which have often persuaded Congress to waive immunities thought to be excessive.[5]

In tacit recognition of the limitation which the very nature of our federal system imposes on state immunity from taxation in order to avoid an ever expanding encroachment upon the federal taxing power, this Court has refused to enlarge the immunity substantially beyond those limits marked out in *Collector* v. *Day, supra.* It has been sustained where, as in *Collector* v. *Day,* the function involved was one thought to be essential to the maintenance of a state government: as where the attempt was to tax income received from the investments of a municipal subdivision of a state, *United States* v. *Railroad Co.,* 17 Wall. 322; to tax income received by a private investor from state bonds, and thus threaten impairment of the borrowing power of the state, *Pollock* v. *Farmers Loan & Trust Co.,* 157 U. S. 429; cf. *Weston* v. *Charleston, supra,* 465–466; or to tax the manufacture and sale to a municipal corporation of equipment for its

---

[5] Compare notes 1 and 2, *supra.*

police force, *Indian Motocycle Co.* v. *United States,* 283 U. S. 570.

But the Court has refused to extend the immunity to a state conducted liquor business, *South Carolina* v. *United States, supra; Ohio* v. *Helvering,* 292 U. S. 360, or to a street railway business taken over and operated by state officers as a means of effecting a local public policy. *Helvering* v. *Powers,* 293 U. S. 214. It has sustained the imposition of a federal excise tax laid on the privilege of exercising corporate franchises granted by a state to public service companies. *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 157. In each of these cases it was pointed out that the state function affected was one which could be carried on by private enterprise, and that therefore it was not one without which a state could not continue to exist as a governmental entity. The immunity has been still more narrowly restricted in those cases where some part of the burden of a tax collected not from a state treasury but from individual taxpayers, is said to be passed on to the state. In these cases the function has been either held or assumed to be of such a character that its performance by the state is immune from direct federal interference; yet the individuals who personally derived profit or compensation from their employment in carrying out the function were deemed to be subject to federal income tax.[6]

---

[6] The follov.ing classes of taxpayers have been held subject to federal income tax notwithstanding its possible economic burden on the state: Those who derive income or profits from their performance of state functions as independent engineering contractors, *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, or from the resale of state bonds, *Willcuts* v. *Bunn,* 282 U. S. 216; those engaged as lessees of the state in producing oil from state lands, the royalties from which, payable to the state, are devoted to public purposes, *Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279; *Burnet* v. *Jergins Trust,* 288 U. S. 508; *Bankline Oil Co.* v. *Commissioner,* 303 U. S. 362, *Helvering* v. *Mountain Producers Corp.,* 303 U. S. .6, overruling *Burnet* v. *Coronado*

In a period marked by a constant expansion of government activities and the steady multiplication of the complexities of taxing systems, it is perhaps too much to expect that the judicial pronouncements marking the boundaries of state immunity should present a completely logical pattern. But they disclose no purposeful departure from, and indeed definitely establish, two guiding principles of limitation for holding the tax immunity of state instrumentalities to its proper function. The one, dependent upon the nature of the function being performed by the state or in its behalf, excludes from the immunity activities thought not to be essential to the preservation of state governments even though the tax be collected from the state treasury. The state itself was taxed for the privilege of carrying on the liquor business in *South Carolina* v. *United States, supra,* and in *Ohio* v. *Helvering, supra;* and a tax on the income of a state officer engaged in the management of a state-owned corporation operating a street railroad was sustained in *Helvering* v. *Powers, supra,* because it was thought that the functions discouraged by these taxes were not indispensable to the maintenance of a state government. The other principle, exemplified by those cases where the tax laid upon individuals affects the state only as the burden

---

*Oil & Gas Co.,* 285 U. S. 393. Similarly federal taxation of property transferred at death to a state or one of its municipalities was upheld in *Snyder* v. *Bettman,* 190 U. S. 249, cf. *Greiner* v. *Lewellyn,* 258 U. S. 384; and a federal tax on the transportation of merchandise in performance of a contract to sell and deliver it to a county was sustained in *Wheeler Lumber Bridge & Supply Co.* v. *United States,* 281 U. S. 572; cf. *Indian Motocycle Co.* v. *United States,* 283 U. S. 570. A federal excise tax on corporations, measured by income, including interest received from state bonds, was upheld in *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 162, *et seq.;* see *National Life Ins. Co.* v. *United States,* 277 U. S. 508, 527; compare the discussion in *Educational Films Corp.* v. *Ward,* 282 U. S. 379, 389, and in *Pacific Co., Ltd.* v. *Johnson,* 285 U. S. 480, 490.

is passed on to it by the taxpayer, forbids recognition of the immunity when the burden on the state is so speculative and uncertain that if allowed it would restrict the federal taxing power without affording any corresponding tangible protection to the state government; even though the function be thought important enough to demand immunity from a tax upon the state itself, it is not necessarily protected from a tax which well may be substantially or entirely absorbed by private persons. *Metcalf & Eddy* v. *Mitchell, supra; Willcuts* v. *Bunn,* 282 U. S. 216.

With these controlling principles in mind we turn to their application in the circumstances of the present case. The challenged taxes laid under § 22, Revenue Act of 1932, c. 209, 47 Stat. 169, 178, are upon the net income of respondents, derived from their employment in common occupations not shown to be different in their methods or duties from those of similar employees in private industry. The taxpayers enjoy the benefits and protection of the laws of the United States. They are under a duty to support its government and are not beyond the reach of its taxing power. A non-discriminatory tax laid on their net income, in common with that of all other members of the community, could by no reasonable probability be considered to preclude the performance of the function which New York and New Jersey have undertaken, or to obstruct it more than like private enterprises are obstructed by our taxing system. Even though, to some unascertainable extent, the tax deprives the states of the advantage of paying less than the standard rate for the services which they engage, it does not curtail any of those functions which have been thought hitherto to be essential to their continued existence as states. At most it may be said to increase somewhat the cost of the state governments because, in

an interdependent economic society, the taxation of income tends to raise (to some extent which economists are not able to measure, see *Indian Motocycle Co. v. United States, supra,* p. 581, footnote 1) the price of labor and materials. The effect of the immunity if allowed would be to relieve respondents of their duty of financial support to the national government, in order to secure to the state a theoretical advantage so speculative in its character and measurement as to be unsubstantial. A tax immunity devised for protection of the states as governmental entities cannot be pressed so far.

The fact that the expenses of the state government might be lessened if all those who deal with it were tax exempt was not thought to be an adequate basis for tax immunity in *Metcalf & Eddy* v. *Mitchell, supra,* in *Group No. 1 Oil Corp.* v. *Bass,* 283 U. S. 279, in *Burnet* v. *Jergins Trust,* 288 U. S. 508; or in *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376.[7] When immunity is claimed from a tax laid on private persons, it must clearly appear that the burden upon the state function is actual and substantial, not conjectural. *Willcuts* v. *Bunn, supra,* 231. The extent to which salaries in business or professions whose standards of compensation are otherwise fixed by competitive conditions may be affected by the immunity of state employees from income tax is to a high degree conjectural.

The basis upon which constitutional tax immunity of a state has been supported is the protection which it affords to the continued existence of the state. To attain that end it is not ordinarily necessary to confer on the state a competitive advantage over private persons in carrying on the operations of its government. There is

---

[7] Upon full consideration, the same principle was recently applied in *James* v. *Dravo Contracting Co.,* 302 U. S. 134, although the limitation there was upon the immunity of the federal government.

no such necessity here, and the resulting impairment of the federal power to tax argues against the advantage. The state and national governments must co-exist. Each must be supported by taxation of those who are citizens of both. The mere fact that the economic burden of such taxes may be passed on to a state government and thus increase to some extent, here wholly conjectural, the expense of its operation, infringes no constitutional immunity. Such burdens are but normal incidents of the organization within the same territory of two governments, each possessed of the taxing power.

During the present term we have held that the compensation of a state employee paid from the state treasury for his service in liquidating an insolvent corporation, where the state was reimbursed from the corporate assets, was subject to income tax. *McLoughlin* v. *Commissioner*, 303 U. S. 218. But the Court has never ruled expressly on the precise question whether the Constitution grants immunity from federal income tax to the salaries of state employees performing, at the expense of the state, services of the character ordinarily carried on by private citizens. The Revenue Act of 1917, considered in *Metcalf & Eddy* v. *Mitchell, supra,* exempted the salaries of all state employees from income tax. But it was held in that case that neither the constitutional immunity nor the statutory exemption extended to independent contractors. In *Brush* v. *Commissioner, supra,* the applicable treasury regulation upon which the Government relied exempted from income tax the compensation of "state officers and employees" for "services rendered in connection with the exercise of an essential governmental function of the State." The sole contention of the Government was that the maintenance of the New York City water supply system was not an essential governmental function of the state. The Government did not attack the regulation. No contention was made

by it or considered or decided by the Court that the burden of the tax on the state was so indirect or conjectural as to be but an incident of the coexistence of the two governments, and therefore not within the constitutional immunity. If determination of that point was implicit in the decision it must be limited by what is now decided.

The pertinent provisions of the regulation applicable in the *Brush* case were continued in Regulations 77, Article 643, under the 1932 Revenue Act, until January 7, 1938, when they were amended to provide that "Compensation received for services rendered to a State is to be included in gross income unless the person receives such compensation from the State as an officer or employee thereof and such compensation is immune from taxation under the Constitution of the United States." The applicable provisions of § 116 of the 1932 Act do not authorize the exclusion from gross income of the salaries of employees of a state or a state-owned corporation. If the regulation be deemed to embrace the employees of a state-owned corporation such as the Port Authority, it was unauthorized by the statute. But we think it plain that employees of the Port Authority are not employees of the state or a political subdivision of it within the meaning of the regulation as originally promulgated—an additional reason why the regulation, even before the 1938 amendment, was ineffectual to exempt the salaries here involved.

The reasoning upon which the decision in *Indian Motocycle Co.* v. *United States, supra,* was rested is not controlling here. Taxation of the sale to a state, which was thought sufficient to support the immunity there, is not now involved. Whether the actual effect upon the performance of the state function differed from that of the present tax we do not now inquire. Compare *Wheeler Lumber Bridge & Supply Co.* v. *United States,* 281 U. S. 572.

As was pointed out in *Metcalf & Eddy* v. *Mitchell, supra,* 524, there may be state agencies of such a character and so intimately associated with the performance of an indispensable function of state government that any taxation of them would threaten such interference with the functions of government itself as to be considered beyond the reach of the federal taxing power. If the tax considered in *Collector* v. *Day, supra,* upon the salary of an officer engaged in the performance of an indispensable function of the state which cannot be delegated to private individuals, may be regarded as such an instance, that is not the case presented here.

Expressing no opinion whether a federal tax may be imposed upon the Port Authority itself with respect to its receipt of income or its other activities, we decide only that the present tax neither precludes nor threatens unreasonably to obstruct any function essential to the continued existence of the state government. So much of the burden of the tax laid upon respondents' income as may reach the state is but a necessary incident to the co-existence within the same organized government of the two taxing sovereigns, and hence is a burden the existence of which the Constitution presupposes. The immunity, if allowed, would impose to an inadmissible extent a restriction upon the taxing power which the Constitution has granted to the federal government.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, concurring.

I agree that this cause should be reversed for the reasons expressed in that part of the opinion just read pointing out that: respondents, though employees of the New York Port Authority, are citizens of the United States;

the tax levied upon their incomes from the Authority is
the same as that paid by other citizens receiving equal net
incomes; and payment of this non-discriminatory income
tax by respondents cannot impair or defeat in whole or in
part the governmental operations of the State of New
York. A citizen who receives his income from a State,
owes the same obligation to the United States as other
citizens who draw their salaries from private sources or
the United States and pay Federal income taxes.

While I believe these reasons, without more, are ade-
quate to support the tax, I find it difficult to reconcile this
result with the principle announced in *Collector* v. *Day*,
11 Wall. 113, and later decisions applying that principle.
This leads me to the conclusion that we should review
and reëxamine the rule based upon *Collector.* v. *Day.*
That course would logically require the entire subject of
intergovernmental tax immunity to be reviewed in the
light of the effect of the Sixteenth Amendment author-
izing Congress to levy a tax on incomes "from whatever
source derived"; and, in that event, the decisions inter-
preting the Amendment would also be reëxamined.[1]

From time to time, this Court has relied upon a doc-
trine evolved from *Collector* v. *Day*, under which incomes
received from State activities thought by the Court to be
non-essential are held taxable, while incomes from ac-
tivities thought to be essential are held non-taxable. The
opinion of the Court in this case refers to that doctrine.
Application of this test has created "a zone of debatable
ground within which the cases must be put upon one side
or the other of the line by what this court has called the
gradual process of historical and judicial 'inclusion and
exclusion.'" *Brush* v. *Commissioner*, 300 U. S. 352, 365.
Under this rule the tax status of every state employee re-

[1] See, *Brushaber* v. *Union Pacific R. Co.*, 240 U. S. 1; *Peck & Co.* v. *Lowe*, 247 U. S. 165, 172; *Eisner* v. *Macomber*, 252 U. S. 189; *Evans* v. *Gore*, 253 U. S. 245.

mains uncertain until this Court passes upon the classification of his particular employment. The result is a confusion in the field of intergovernmental tax immunity which I believe could be clarified by complete review of the subject. Testing taxability by judicial determination that state governmental functions are essential or nonessential, contributes much to the existing confusion. I believe the present case affords occasion for appropriate and necessary abandonment of such a test, particularly since recent decisions[2] have already substantially advanced toward a reëxamination of the doctrine of intergovernmental immunity.

The present controversy illustrates the necessity for further reëxamination. New York created the Port Authority with power to engage in activities which that State believed to be essential. Yet, under this test, New York's determination is not final until reviewed in a tax litigation between the government and a single citizen.

Conceptions of "essential governmental functions" vary with individual philosophies. Some believe that "essential governmental functions" include ownership and operation of water plants, power and transportation systems, etc. Others deny that such ownership and operation could ever be "essential governmental functions" on the ground that such functions "could be carried on by private enterprise." A federal income tax levied against the manager of the state-operated elevated railway company of Boston was sustained even though this manager was a public officer appointed by the Governor of Massachusetts "with the advice and consent of the council."[3] On the other hand, the federal government was denied—

---

[2] See, *James* v. *Dravo Contracting Co.*, 302 U. S. 134; *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362; *Helvering* v. *Mountain Producers Corp.*, 303 U. S. 376 (overruling *Gillespie* v. *Oklahoma*, 257 U. S. 501 and *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393).

[3] *Helvering* v. *Powers*, 293 U. S. 214, 222, 223.

although with strong dissent—the right to collect an income tax from the chief engineer in charge of New York City's municipally owned water supply.[4] An implied constitutional distinction which taxes income of an officer of a state-operated transportation system and exempts income of the manager of a municipal water works system manifests the uncertainty created by the "essential" and "non-essential" test.

There is not, and there cannot be, any unchanging line of demarcation between essential and non-essential governmental functions. Many governmental functions of today have at some time in the past been non-governmental. The genius of our government provides that, within the sphere of constitutional action, the people—acting not through the courts but through their elected legislative representatives—have the power to determine as conditions demand, what services and functions the public welfare requires.

Surely, the Constitution contains no imperative mandate that public employees—or others—drawing equal salaries (income) should be divided into taxpaying and non-taxpaying groups. Ordinarily such a result is discrimination. Uniform taxation upon those equally able to bear their fair shares of the burdens of government is the objective of every just government. The language of the Sixteenth Amendment empowering Congress to "collect taxes on incomes, from whatever source derived"—given its most obvious meaning—is broad enough to accomplish this purpose.

MR. JUSTICE BUTLER, dissenting.

So far as concerns liability for federal income tax, the salaries paid by the Port Authority to its officers and employees are not distinguishable from salaries paid by

---

[4] *Brush* v. *Commissioner*, 300 U. S. 352; cf., *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514.

States to their officers and employees. The judgment of the Circuit Court of Appeals should therefore be affirmed on the principle applied in *McCulloch* v. *Maryland* (1819) 4 Wheat. 316, that under the Constitution States are without power to tax instrumentalities of the United States and in *Collector* v. *Day* (1871) 11 Wall. 113, that the United States is without power to tax the salary of a state officer. That principle has been followed in a long line of decisions. In *Indian Motocycle Co.* v. *United States* (1931) 283 U. S. 570, we held the United States without power to tax the sale of a motorcycle to a municipal corporation for use in its police service. The Court, speaking through Mr. Justice Van Devanter, said (p. 575):

"It is an established principle of our constitutional system of dual government that the instrumentalities, means and operations whereby the United States exercises its governmental powers are exempt from taxation by the States, and that the instrumentalities, means and operations whereby the States exert the governmental powers belonging to them are equally exempt from taxation by the United States. This principle is implied from the independence of the national and state governments within their respective spheres and from the provisions of the Constitution which look to the maintenance of the dual system. *Collector* v. *Day*, 11 Wall. 113, 125, 127; *Willcuts* v. *Bunn*, 282 U. S. 216, 224–225. Where the principle applies it is not affected by the amount of the particular tax or the extent of the resulting interference, but is absolute. *McCulloch* v. *Maryland*, 4 Wheat. 316, 430; *United States* v. *Baltimore & Ohio R. Co.*, 17 Wall. 322, 327; *Johnson* v. *Maryland*, 254 U. S. 51, 55–56; *Gillespie* v. *Oklahoma*, 257 U. S. 501, 505; *Crandall* v. *Nevada*, 6 Wall. 35, 44–46."

Following that case, we recently applied the principle in *N. Y. ex rel. Rogers* v. *Graves* (January 4, 1937) 299

U. S. 401, to prevent the State of New York from taxing the salary of counsel of the Panama Railway Company, a federal instrumentality, and in *Brush* v. *Commissioner* (March 15, 1937) 300 U. S. 352, to prevent the United States from taxing the salary of the chief engineer of the bureau of water supply for the city of New York. In *Helvering* v. *Therrell* (February 28, 1938) 303 U. S. 218, holding that the federal government has power to tax compensation paid to attorneys and others out of corporate assets for necessary services rendered about the liquidation of insolvent corporations by state officers proceeding under her statutes, we said (p. 223):

"Among the inferences which derive necessarily from the Constitution are these: No State may tax appropriate means which the United States may employ for exercising their delegated powers; the United States may not tax instrumentalities which a State may employ in the discharge of her essential governmental duties—that is those duties which the framers intended each member of the Union would assume in order adequately to function under the form of government guaranteed by the Constitution."

The Court seemingly admitting that it would be futile to attempt to distinguish the cases now before us from the *Brush* case, overrules it by declaring that it must be limited by what is now decided. The Solicitor General did not in any manner raise the point on which the Court puts this decision. He sought reversal on the grounds that the Port Authority's activities are proprietary in nature; that it is not an agency created by the States alone; that it operates in interstate commerce subject to the paramount power of Congress. Indeed, he expressly disclaimed intention to ask re-examination of the doctrine of immunity on which the *Brush* case rests. In substance, as well as in the language used, the decision just announced substitutes for that doctrine the

proposition that, although the federal tax may increase cost of state governments, it may be imposed if it does not curtail functions essential to their existence. Expressly or *sub silentio,* it overrules a century of precedents. Cf. *James* v. *Dravo Contracting Co.* (December 6, 1937) 302 U. S. 134, 152, 161; *Helvering* v. *Mountain Producers Corporation* (March 7, 1938) 303 U. S. 376. As they stood when the cases now before us were in the Circuit Court of Appeals, our decisions required it to hold that the salaries paid by the Port Authority to respondents are not subject to federal taxation. I would affirm its judgments.

Mr. Justice McReynolds concurs in this opinion.