## UNITED STATES v. STATE OF NEW YORK et al.

### No. 2503.

District Court, N. D. New York.

Nov. 17, 1942.

Ralph L. Emmons, U. S. Atty., of Binghamton, N. Y. (B. F. Tompkins, Asst. U. S. Atty., of Syracuse, N. Y., Samuel O. Clark, Jr., Asst. Atty. Gen., and Andrew D. Sharpe and Alvin J. Rockwell, Sp. Assts. to Atty. Gen., of counsel), for plaintiff.

John J. Bennett, Jr., Atty. Gen., of New York (Henry Epstein, of Albany, N. Y., Milton Kaplan, of· Cortland, N. Y., and Jack Goodman, of Albany, N. Y., of counsel), for the State of New York.

Schwarte, Slade, Harrington & Goldsmith, of Saratoga Springs, N. Y. (John A. Slade, and Denis J. Harrington, both of Saratoga Springs, N. Y., of counsel), for Saratoga Springs Commission and Saratoga Springs Authority.

BRYANT, District Judge.

This is a suit for the collection of taxes, penalties and interest in the amount of $4,473.50, and additional interest from various dates between December 14, 1932, and January 3, 1937, inclusive, accruing under section 615(a) (5) of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 613.

The question at issue is whether, in bottling for sale and selling certain mineral and table water, the State of New York and·its agencies, Saratoga Springs Commission and Saratoga Springs Authority, are immune under the Federal Constitution from the taxes imposed by said Revenue Act. This Act imposed upon all natural or artificial mineral or table water "sold by the producer, bottler, or importer thereof, in bottles or other closed containers, at over 12½ cents per gallon, a tax of 2 cents per gallon".

There exist at and in the vicinity of Saratoga Springs, New York, mineral springs having a recognized medicinal value, the waters of which are prescribed by physicians both for bathing and internal use. Ever since Indian days these waters have been drunk and used for bathing purposes by vast numbers of people. Prior to the year 1912, a number of the springs had been acquired, and additional springs had been drilled, by private companies engaged in the extraction of the natural carbonic acid gas from the waters for commercial use. In order to increase the flow of these springs, pumps had been installed. As a result of this usage, immediately prior to the year 1911, no water flowed from any of the previous flowing or spouting springs; the water level had sunk several hundred feet below the surface of the ground and the springs were in danger of total extinction. Commencing in the year 1911, the State of New York, for the purpose of restoring the springs and preserving the waters for the benefit of the people of the State and the public generally, acquired all of the then existing springs. Title to all of the lands were taken in the name of the State. These lands, and the facilities located upon them, are usually referred to as the "Saratoga Reservation".

After acquisition by the State and prior to 1930, a private corporation, operating under a lease from the State, bottled and sold mineral and table water taken from the springs.

Defendant Saratoga Springs Commission was created by Chapter 866 of the New York Laws of 1930 as a temporary commission for·the term of seven years and was continued as a permanent commission in the State Conservation Department by Chapter 279 of the Laws of 1937. It is a public agency of the State of New York. Its activities and liabilities were and are those of the State. It cannot sue nor be sued in its own name. In 1930, soon after creation, it took over the custody and control ·of the Reservation. One of its first acts was the purchase of the private corporation's lease and its rights to bottle and sell waters. With money appropriated by the State, the Commission built a modern and efficient bottling works and on May 1, 1932, took over the bottling and sale of the waters. It continued this activity until 1933.

In 1933, Saratoga Springs Authority· came into existence under Chapter 208 of the New York Laws of 1933. It is an agency of the State of New York, a public benefit corporation with its powers, duties and purposes prescribed by law. It may sue and be sued in its own name without joining the State. In 1933, soon after creation, it took over the custody, control and operation of the Reservation. Since that time, among other things, it has carried on the business of bottling and selling mineral and spring water.

The State of New York has expended, in the purchase of lands and the improvements

erected thereon, in addition to $3,200,000 received as a loan from the Reconstruction Finance Corporation, approximately $5,620,500. With moneys appropriated and borrowed as above stated, the Commission and the Authority, pursuant to authorization of the New York Legislature, have constructed a drink hall, two bath houses for administering mineral baths, an administration and research laboratory building which includes a small theatre, a bottling works (referred to above), a recreation center with swimming pool, golf course, outdoor gymnasium, tennis courts and other facilities for outdoor recreation and a hotel-sanitarium. They have also remodeled a second drink hall located in the downtown business section of the City. The foregoing buildings and facilities, as well as two older bath houses and certain drink pavillions on the premises at the time of purchase, are located upon and are administered as a part of the Reservation. All of these buildings, except the hotel-sanitarium and the theatre, were operated by the Saratoga Springs Commission during the period June, 1932, to September, 1933, inclusive, and, since the latter date, have been operated by the Saratoga Springs Authority. The Authority also operates a bus line from the City of Saratoga to the baths and springs on the Reservation. The hotel-sanitarium has been leased, since its construction in 1935, for private operation on a year around basis and the theatre is and was leased for private operation during the summer months.

The facilities of the Reservation have at all times been available to citizens of New York State and to the public generally on equal terms. Fees are charged for admission to the two drink halls, the bath houses, the recreation center and the summer theatre, although a substantial number of charity treatments are also administered at the bath houses. In addition fares are charged for transportation on the bus line. All receipts, including the income from the lease of the hotel-sanitarium and receipts from sales of the bottled water, are used in the maintenance and upkeep of the Reservation. The gross receipts have never been sufficient to meet annual expenses, exclusive of interest and amortization charges on the loan. Annually, the Legislature of the State of New York has appropriated substantial sums for current operations, interest charges and amortization payments.

The gross sales of bottled water amount to approximately $125,000 per year. The Commission and the Authority have expended something above an average of $20,000 per year for advertising of the bottled water. It has been, and is, the consistent policy of the Commission and the Authority steadily to increase the volume of water bottled and sold and to derive the largest profit possible from the operation. The larger the sales and the greater the profits, the less deficiency there will be for the State to meet annually.

Upon demand the Commission and the Authority, under protest, filed with the Collector of Internal Revenue at Albany the amount of mineral and plain water bottled and sold during the period in question. The reports showed 216,390½ gallons. On the basis of these returns, taxes, penalties and interest were assessed in amounts above stated and demand for payments were made. No part of these amounts or the interest accruing thereon has been paid.

Discussion of tax immunity by virtue of the necessary implications of our dual system of government stems from McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579, which was the basis fifty years later of the decision in Collector v. Day, 11 Wall. 113, 20 L.Ed. 122. In view of later decisions, and the review the cited decisions have had therein, consideration of these cases seems unnecessary. Plaintiff finds particular comfort, if not the whole support for its position, in Helvering v. Gerhardt, 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427, and the three pertinent earlier cases, which in that opinion won the express approval of the Court (State of South Carolina v. United States, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261; State of Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307; Helvering v. Powers, 293 U.S. 214, 55 S.Ct. 171, 79 L.Ed. 291), and in Allen v. Regents, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448. The facts in these cases differ so materially from the facts in the case at bar that they cannot be considered direct precedents. However, the rules therein established must be followed. One is that "the immunity implied from the dual sovereignty recognized by the Constitution does not extend to business enterprises conducted by the States for gain". Allen v. Regents, supra, 304 U.S. page 453, 58 S.Ct. page 986, 82 L.Ed. 1448.

18

Defendants argue strenuously that they are not conducting business for gain. It is their well supported contention that the State of New York is engaged in a broad program of conservation of natural resources, promotion of health and creation of recreation facilities of which the sale of bottled water is only a small part. Their argument seems to be answered by the Regents case. The State of Georgia was engaged in a governmental function, the carrying out of a program of public education. The holding of athletic contests was a fractional part of that program and yet those contests were not considered mere incidents in the governmental program. There are marked differences of facts in the two cases. In the Regents case the tax was paid by the public. Refusal of immunity placed no burden upon the State. At most it prevented increased enrichment. Here the tax, if allowed, is a direct burden on the State. Its payment will reduce directly the revenues of the State. However, in view of the Regents case and Helvering v. Gerhardt, supra, it cannot be said that the business, as carried on, is free from the burden of a non-discriminating tax laid on sales.

Defendants further contend that the State of New York is engaged only in the sale of its natural resources; that under our system of dual sovereignty the United States cannot tax those resources nor the proceeds received from their sale. With the last proposition I am in accord, but I cannot accept the proposition that the State was only selling its natural resources. It took its natural resources and, through a bottling process, put those resources into a preserved condition where they could be sold to the public in competition with private waters. The bottling and sale of the waters was a business enterprise conducted for gain rather than simply a sale of the State's natural resources. Allen v. Regents, supra, applies.

Plaintiff is entitled to judgment. For the period, June 21, 1932, to September 1933, inclusive, the waters were bottled and sold by the Saratoga Springs Commission. For the liability arising during that period, plaintiff may have judgment against the Saratoga Springs Commission and the State of New York jointly. For the liability arising during the period October, 1933, to May 10, 1934, plaintiff is entitled to judgment against the Saratoga Springs Authority.