443 S.E.2d 462

**Dallas C. BROWN, Jr., et al., Appellees,**

**v.**

**Alan L. MIERKE, Acting State Tax Commissioner of the State of West Virginia, Appellant.**

**No. 21923.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 25, 1994.

Decided March 24, 1994.

---

Robert W. Kiefer, Jr., Hamb & Poffenbarger, Nelson R. Bickley, Bickley, Jacobs & Barkus, Charleston, for appellees.

Darrell V. McGraw, Jr., Silas B. Taylor, Stephen Stockton, Atty. Gen.'s Office, Charleston, for appellant.

NEELY, Justice.

Subsection (c)(6) of *West Virginia Code* 11–21–12 [1993] provides for a modification reducing federal adjusted gross income for state income tax purposes in the entire amount a taxpayer receives from, "pensions and annuities … under any West Virginia police, West Virginia firemen's retirement system or the West Virginia Department of Public Safety Death, Disability and Retirement Fund." As of 1991, the 1,624 retired police and firefighters exempted from taxation by *Code* 11–21–12(c)(6) [1993] constitute about four percent of all state and local retirees in West Virginia.

The appellees before us, former officers and enlisted personnel of the armed forces of the United States, are retired and receive military pensions. Federal tax law includes military pensions in federal adjusted gross income. Under *West Virginia Code* 11–21–12(a) [1993], federal adjusted gross income constitutes a person's adjusted gross income for purposes of the West Virginia personal income tax, subject to exemptions set forth in *West Virginia Code* 11–21–12(b) and (c) [1993]. *West Virginia Code* 11–21–12(c)(5) [1993] allows a modification decreasing federal adjusted gross income by the amount of all forms of military retirement in a maximum amount of $2,000. A military retiree (or any other taxpayer) who has reached age 65 is entitled to reduce his or her adjusted gross income in a maximum amount of $8,000. *West Virginia Code* 11–21–12(c)(7) [1993].

Because military pensions are included in West Virginia adjusted gross income, the West Virginia personal income tax is imposed on military retirement pay. *Code* 11–21–3 [1993]. Subject to the $2,000 exclusion of *Code* 11–21–12(c)(5) [1993] or the $8,000 exclusion of *West Virginia Code* 11–21–12(c)(7) [1993], military retirees are required to report their military retirement benefits as income on their tax returns. *West Virginia Code* 11–21–51 [1987].

In the circuit court, the appellees sought a declaratory judgment to establish whether the West Virginia tax scheme in question—a scheme that taxes the lion's share of federal military pensions while exempting retirement benefits received from any West Virginia municipal police retirement system, West Virginia municipal firemen's retirement system, and the West Virginia Department of Public Safety Death, Disability and Retirement Fund—discriminates against military retirees in violation of 4 U.S.C. § 111, the Public Salary Tax Act of 1939. The circuit court determined that West Virginia's scheme *does* discriminate against military retirees. Upon petition of the State Tax Commissioner, we granted this appeal. We reverse.

## I.

A concise history of the doctrine of intergovernmental tax immunity as well as the role of Section 111 of the Public Salary Act of 1939, 4 U.S.C. § 111, is provided by Justice Kennedy in *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 810–813, 109 S.Ct. 1500, 1505–06, 103 L.Ed.2d 891 (1989):

> Section 111 was enacted as part of the Public Salary Tax Act of 1939, the primary purpose of which was to impose federal income tax on the salaries of all state and local government employees. Prior to adoption of the Act, salaries of most government employees, both state and federal, generally were thought to be exempt from taxation by another sovereign under the doctrine of intergovernmental tax immunity. This doctrine had its genesis in *McCulloch v. Maryland*, [17 U.S. (]4 Wheat[)] 316, 4 L.Ed. 579 (1819), which held that the State of Maryland could not impose a discriminatory tax on the Bank of the United States. Chief Justice Marshall's opinion for the Court reasoned that the Bank was an instrumentality of the Federal Government used to carry into effect the Government's delegated powers, and taxation by the State would unconstitutionally interfere with the exercise of those powers. *Id.* at 425–437.

> For a time, *McCulloch* was read broadly to bar most taxation by one sovereign of

the employees of another. *See Collector v. Day,* [78 U.S. (]11 Wall.[) ] 113, 124–128, 20 L.Ed. 122 (1871) (invalidating federal income tax on salary of state judge); *Dobbins v. Commissioners of Erie County,* [41 U.S. (]16 Pet[)] 435, 10 L.Ed. 1022 (1842) (invalidating state tax on federal officer). This rule "was based on the rationale that any tax on income a party received under a contract with the government was a tax on the contract and thus a tax 'on' the government because it burdened the government's power to enter into the contract." *South Carolina v. Baker,* 485 U.S. 505, 518, 108 S.Ct. 1355, 1364, 99 L.Ed.2d 592 (1988).

> In subsequent cases, however, the Court began to turn away from its more expansive applications of the immunity doctrine. Thus, in *Helvering v. Gerhardt,* 304 U.S. 405, 58 S.Ct. 969, 82 L.Ed. 1427 (1938), the Court held that the Federal Government could levy nondiscriminatory taxes on the incomes of most state employees. The following year, *Graves v. New York ex rel. O'Keefe,* 306 U.S. 466, 486–487, 59 S.Ct. 595, 601–602, 83 L.Ed. 927 (1939), overruled the *Day–Dobbins* line of cases that had exempted government employees from non-discriminatory taxation. After *Graves,* therefore, intergovernmental tax immunity barred only those taxes that were imposed directly on one sovereign by the other or that discriminated against a sovereign or those with whom it dealt.

> It was in the midst of this judicial revision of the immunity doctrine that Congress decided to extend the federal income tax to state and local government employees. The Public Salary Tax Act was enacted after *Helvering v. Gerhardt, supra,* had upheld the imposition of federal income taxes on state civil servants, and Congress relied on that decision as support for its broad assertion of federal taxing authority. S.Rep. No. 112, 76th Cong., 1st Sess., 5–9 (1939) H.R.Rep. No. 26, 76th Cong., 1st Sess., 2–3 (1939). However, the Act was drafted, considered in Committee, and passed by the House of Representatives before the announcement of the decision in *Graves v. New York ex rel. O'Keefe, supra,* which for the first time permitted state

taxation of federal employees. As a result, during most of the legislative process leading to adoption of the Act it was unclear whether state taxation of federal employees was still barred by intergovernmental tax immunity despite the abrogation of state employees' immunity from federal taxation. See H.R.Rep. No. 26, *supra,* at 2 ("There are certain indications in the case of *McCulloch v. Maryland,* [17 U.S. (]4 Wheat.[)] 316 [4 L.Ed. 579] (1819), ... that ... Federal officers and employees may not, without the consent of the United States, be subjected to income taxation under the authority of the various States").

Dissatisfied with this uncertain state of affairs, and concerned that considerations of fairness demanded equal tax treatment for state and federal employees, Congress decided to ensure that federal employees would not remain immune from state taxation at the same time that state government employees were being required to pay federal income taxes. See S.Rep. No. 112, *supra,* at 4; H.R.Rep. No. 26, *supra,* at 2. Accordingly, § 4 of the proposed Act (now § 111) expressly waived whatever immunity would have otherwise shielded federal employees from nondiscriminatory state taxes.

By the time the statute was enacted, of course, the decision in *Graves* had been announced, so the constitutional immunity doctrine no longer proscribed nondiscriminatory state taxation of federal employees. In effect, § 111 simply codified the result in *Graves* and foreclosed the possibility that subsequent judicial reconsideration of that case might reestablish the broader interpretation of the immunity doctrine.

Section 111 did not waive all aspects of intergovernmental tax immunity, however. The final clause of the section contains an exception for state taxes that discriminate against federal employees on the basis of the source of their compensation. This nondiscrimination clause closely parallels the nondiscrimination component of the constitutional immunity doctrine which has, from the time of *McCulloch v. Maryland,* barred taxes that "operat[e] so as to discriminate against the Government or those with whom it deals." *United States*

*v. City of Detroit,* 355 U.S. 466, 473, 78 S.Ct. 474, 478, 2 L.Ed.2d 424 (1958). *See also McCulloch v. Maryland, supra,* [17 U.S. (]4 Wheat[)] ] at 436–437; *Miller v. Milwaukee,* 272 U.S. 713, 714–715, 47 S.Ct. 280, 280–281, 71 L.Ed. 487 (1927); *Helvering v. Gerhardt, supra,* 304 U.S., at 413, 58 S.Ct., at 972; *Phillips Chemical Co. v. Dumas Independent School Dist.,* 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384 (1960); *Memphis Bank & Trust Co. v. Garner,* 459 U.S. 392, 397, and n. 7, 103 S.Ct. 692, 696, and n. 7, 74 L.Ed.2d 562 (1983).

## II.

Under the appellees' theory of the case, the Supreme Court's holdings in *Davis v. Michigan, supra* and *Barker v. Kansas,* 503 U.S. ——, 112 S.Ct. 1619, 118 L.Ed.2d 243 (1992) establish that West Virginia's exemption of certain firefighters' and police officers' retirement benefits renders the tax of military pensions prohibited and discriminatory. We disagree. The situation this case comprehends is surpassingly narrow: the number of retirees exempted under the allegedly discriminatory statute constitutes less than four percent of all *State* government retirees in West Virginia and a far lower percentage of all tax-filing retirees; the appellees have failed to demonstrate that their job descriptions during any substantial part of their active service corresponded to the job descriptions of municipal firefighters, municipal police officers or state police officers; all tax filers retired from the West Virginia Public Employees Retirement System and the West Virginia Teachers Retirement System are taxed identically with retired federal military personnel; and, persons retired from the Armed Forces of the United States, the West Virginia Public Employees Retirement System, and the West Virginia Teachers Retirement System receive *more* favorable tax treatment than persons retired from either the West Virginia Judicial Retirement System or private industry.

In such specialized circumstances, the controlling case is neither *Davis, supra* or *Barker, supra.* In *Davis, supra,* the Supreme Court held that Michigan's income tax

scheme violated 4 U.S.C. § 111 and the constitutional doctrine of intergovernmental tax immunity because Michigan fully taxed all federal pensions while exempting *all* state pensions. The Court held that any difference in tax treatment between federal and state employees must be justified by significant differences between the two groups. According to the Court, Michigan's justification for its statutory exemption—its interest in hiring and retaining qualified civil servants—was irrelevant to any inquiry into the difference between the two classes, no matter how substantial such an interest might be.

In response to Michigan's argument that the exemption was designed to compensate for comparatively lesser returns afforded by state retirement benefits as compared to federal benefits, the Supreme Court stated that although this was probably true when comparing the average state employee to the average federal employee, it was certainly not true in a number of instances. Furthermore, the court concluded, if the difference in pay were truly the state's motivation, it would have adopted a statutory scheme based upon the amount of retirement benefits received, not upon *the source of the benefits*.

After *Davis,* the Supreme Court held in *Barker v. Kansas, supra,* that 4 U.S.C. § 111 also applies to military retirement. In *Barker,* Kansas taxed military retirement while exempting all state and local retirement benefits and most federal pensions.[1] The Supreme Court found the tax on military pensions discriminatory under 4 U.S.C. § 111 because it failed to pass the test of "whether the inconsistent tax treatment is directly related to, and justified by significant differences between the two classes."

The appellees in the case before us maintain that, pursuant to the holding in *Davis* and *Barker,* the test of whether a state tax scheme violates 4 U.S.C. § 111 is whether there exists substantial differences between the two classes that justify the discrimination. We agree that the holdings in *Davis* and *Barker* would appear to call into ques-

tion West Virginia's scheme that exempts a narrow class of state employees from state taxation while taxing federal employees. However, West Virginia's scheme differs from the Michigan and Kansas schemes invalidated by the Supreme Court in that there is no intent in the West Virginia scheme to discriminate *against* federal retirees; rather, the intent is to give a benefit to a very narrow class of former state and local employees. This may at first appear to be a distinction without a difference, but political reality demonstrates that the distinction is viable, as the case of *Department of Revenue v. AFC Industries,* —— U.S. ——, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994), discussed *infra,* demonstrates. In both Michigan and Kansas, the schemes struck down by the Supreme Court were consciously designed to place lower taxes on the better organized (and therefore politically more powerful) constituencies and higher taxes on the badly organized (and therefore politically weaker) constituencies.

It hardly takes a road map for us to figure out that state employees in Michigan constitute a powerful, ongoing lobby that is well organized, well funded, and backed up by election day artillery. In contrast, federal employees in Michigan constitute a small proportion of the electorate, with lobbying efforts aimed predominantly at Washington from whence cometh both their rate of pay and conditions of employment. Thus, although postal workers may be a well-organized national lobby, they are a nugatory presence in a local state house.

In Kansas, the tax scheme accommodated both retired state employees and most retired federal civilian employees, imposing higher taxes on only retired military personnel and certain exotic federal civilian retirees like CIA agents and federal judges. In doing so, the Kansas legislature chose to exact taxes from a segment of the population unlikely to retaliate politically because their national service had kept them away from the local political clubhouse.

---

1. Military retirement, the retirement benefits received by certain officials of the Central Intelligence Agency, National Oceanic and Atmospheric Association, the Public Health Service and retired federal judges were taxable under the Kansas statute.

In the case before us, three facts conclusively demonstrate that no calculated scheme or plan exists to discriminate against retired military personnel based on the source of their income: (1) retired military personnel are treated *more* favorably than West Virginians who have retired from civilian occupations; (2) retired military personnel are treated equally with all persons retired from the West Virginia Public Employees Retirement System and the West Virginia Teachers Retirement System; and (3) along with state public employees and teachers, military retirees are treated *substantially more favorably* than persons retired from the West Virginia Judicial Retirement System.

In *Department of Revenue v. ACF Industries, Inc., supra,* Oregon exempted from its *ad valorem* property tax various classes of business personal property, but not railroad cars owned by various carlines. The carlines filed suit in federal court alleging that the tax violated the Railroad Revitalization and Regulatory Reform Act of 1976 because it exempted certain classes of commercial property from taxation whilst taxing railroad cars in full. The Supreme Court held that the Railroad Revitalization and Regulatory Reform Act of 1976 did not limit the states' discretion to *exempt* non-railroad property (but not railroad property) from generally applicable *ad valorem* property taxes. The court held that "another tax that discriminates against a rail carrier" is a residual category designed to reach any discriminatory state tax, including property taxes, but that the whole structure of the tax protections offered by the Railroad Revitalization and Regulatory Reform Act of 1976 did not intend to *prohibit normal property tax exemptions.* In this last regard the court said:

> "We hold that a state may grant exemptions from a generally applicable ad valorem property tax without subjecting the taxation of railroad property to challenge under the relevant provision of the 4R Act, Section 306(1)(d), 49 U.S.C. [§] 11503(b)(4)."

That today's decision in this military pension case is grounded on a railroad car case rather than a state employee exemption case may at first seem bizarre, but the facts of the railroad car case (*AFC Industries*) are far closer to the case before us than to either *Davis* or *Barker.* Indeed, in *AFC Industries* the Supreme Court specifically made reference to the problem of states' taxing constituencies that had little, if any, local political power. In this regard the Court stated:

> "When drafting the legislation, Congress was aware that the railroads 'are easy prey for state and local tax assessors' in that they are 'nonvoting, often nonresident, targets for local taxation' who cannot easily remove themselves from the locality." *AFC Industries, supra* —— U.S. ——, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994).

\* \* \* \* \* \*

> "... this is not a case in which the railroads—either alone or as part of some isolated and targeted group—are the only commercial entities subject to an ad valorem property tax." *Id.* at ——, 114 S.Ct. at 851 (1994).

In the case before us, the state's decision to exempt fire and police pensions from taxation under the state income tax is more like the property tax exemptions in *AFC Industries* than the broad-based schemes to discriminate found in *Davis* and *Barker.*[2] Thus, the statutory language of 4 U.S.C. § 111 is relevant:

> "The United States consents to the taxation of pay or compensation for personal services as an officer or employee of the United States ... by a duly constituted taxing authority having jurisdiction, *if the taxation does not discriminate against the officer or employee because of the source of pay or compensation.*" [Emphasis added].

That the judges of this Court, statewide elected officials with rather substantial personal political followings and not a few friends in the West Virginia Legislature, are taxed at a substantially *higher* rate than retired members of the Armed Forces of the United States, and both military retirees and

---

**2.** If nothing else, none of the petitioners before us has asserted that his or her job description was in any way close to the job description of firemen or state and local policemen.

the majority of retired state employees are taxed at *lower* rates than West Virginians retired from private sector occupations renders it extraordinarily difficult to infer that *any* of the pernicious dynamics that either the ancient doctrine of intergovernmental tax immunity or 4 U.S.C. § 111 are designed to remedy is implicated.[3]   Accordingly, the judgment of the Circuit Court of Kanawha County is reversed.

Reversed.

**3.** As Professor Ely puts it in *Democracy and Distrust* 84–85 (1980):

> [E]ven before the enactment of the Equal Protection Clause, the Supreme Court was prepared at least under certain conditions to protect the interests of minorities that were not literally voteless by constitutionally tying their interests to those of groups that did possess political power—and, what is the same thing, by intervening to protect such interests when it appeared that such a guarantee of "virtual representation" was not being provided.   In the landmark case of *McCulloch v. Maryland*, decided in 1819, the Court invalidated a state tax on the operations of all banks (preeminently including the Bank of the United States) not characterized by the state legislature.   Toward the end of Chief Justice Marshall's Court opinion, there appears a potentially baffling qualification: "This opinion . . . does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state." [footnote omitted].   What ever did he have in mind?   It can't have been that he knew the sorts of property taxes mentioned were in fact less burdensome, for nothing in his opinion had indicated that the tax the Court was invalidating was in fact disabling or even burdensome.   Indeed it was at the heart of his argument that no such showing was necessary: "the power to tax involves the power to destroy" and a little tax on bank operations was declared as impermissible as a big one.   A tax on the land on which the local branch of the Bank of the United States sits also has the potential to destroy, however.   *Either* tax, if it got out of hand—and there was no indication that either had—could destroy the Bank.
>
> By now we should be in a position to spot the trick right away: it lies in Marshall's indication that the real estate tax would have to be "in common with the other real property within the state," the tax on any interest held by citizens "in common with other property of the same description throughout the state."   The unity of interest with all Maryland property owners assured by this insistence on equal treatment would protect the Bank from serious disablement by taxes of this sort.   The power to tax real or personal property *is* potentially the power to destroy.   But people aren't lemmings, and while they may agree to disadvantage themselves somewhat in the service of some overriding social good, they aren't in the habit of destroying themselves en masse.